THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER WASHINGTON, JR., Defendant-Appellant.

Second District    No. 79-465

Opinion filed November 19, 1980.

Mary Robinson, of State Appellate Defender's Office, of Elgin, Ralph

Ruebner, of State Appellate Defender's Office, of Chicago, and Herbert Hill and Randy K. Johnson, both of Aurora, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Cynthia N. Schneider, both of State's Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

This is the second appeal in this case and results from a second conviction for murder and armed robbery. The defendant was convicted of armed robbery and murder in his first trial; however this court reversed his conviction and remanded for a new trial because of a violation of the defendant's right, pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, to remain silent and not be further interrogated by the police after he had requested the assistance of counsel. (*People v. Washington* (1976), 41 Ill. App. 3d 475.) Upon appeal our supreme court affirmed the decision of this court. *People v. Washington* (1977), 68 Ill. 2d 186, *cert. denied* (1978), 435 U.S. 981, 56 L. Ed. 2d 72, 98 S. Ct. 1631.

It is clear that both this court and the supreme court placed the decision to grant a new trial on a violation of the *Miranda* right to be free of questioning by the police after expressing a desire to consult a lawyer. This court said:

"In the case at bar, while the police officers provided a 'fresh set of warnings' after the defendant requested counsel, they resumed interrogation with respect to the same crimes which had been the subject of the earlier interrogation. The defendant's right to cut off questioning was therefore not 'scrupulously honored' and the statements made by defendant after he requested counsel should have been suppressed and were inadmissible." 41 Ill. App. 3d 475, 480-81.

Our supreme court, in affirming the decision, said:

"Although we agree with the People that the right to counsel may be waived (*People v. Morgan* 67 Ill. 2d 1), we conclude that the People did not meet the 'heavy burden * * * to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained counsel.'" 68 Ill. 2d 186, 194.

The basis of the decision in the appeal of the first trial is here emphasized because the tactical situation in the second trial and the appeal therefrom was entirely altered. Although the decision of the United States Supreme Court in *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (allowing the use of a statement taken in violation of *Miranda* strictures for impeachment purposes) was rendered

before the first Washington trial, the State did not invoke that case. It relied apparently on the decision in *People v. White* (1975), 61 Ill. 2d 288, where the court held that there was no *Miranda* violation in a case involving a somewhat similar situation except that the questioning of the suspect after he expressed a desire to see a lawyer was with regard to unrelated crimes and there was a longer period of time between the defendant's expressed desire for counsel and the ultimate confession. In any event, at the second trial, which is the subject of this appeal, the State, accepting the guidelines laid down by the supreme court, did not attempt to introduce the defendant's inculpatory statements in its case in chief. However, prior to commencement of trial, the defendant made a motion *in limine* seeking a ruling that the State could not introduce the statements made to the police for any purpose, including impeachment of defendant if he took the stand in his own behalf. The trial court ruled the statements would be suppressed in the State's case in chief, but could be introduced for purposes of impeachment. The defendant did not take the stand. The defendant, with his post-trial motion, submitted an affidavit to the effect that he had not testified in his own behalf because of the threat of impeachment if he did. We may reasonably believe this contention since, while the defendant had one previous felony conviction, it was more than 10 years before the second trial and under *People v. Montgomery* (1971), 47 Ill. 2d 510, would not have been admissible to impeach his credibility.

In this appeal from his second conviction the defendant contends that the inculpatory statements to the police were made by the defendant under such circumstances as to render them involuntary and inadmissible for any purpose whatever; therefore the threat to use such statements for impeachment purposes, resulting in his failure to testify in his own behalf, deprived him of a fair trial. Thus the strictures of *Miranda* are not controlling as to the issue raised.

We must determine if the trustworthiness of the evidence satisfies legal standards. When the evidence in question consists of inculpatory statements, then the critical issue of trustworthiness is determined by whether the inculpatory statements were voluntary. To determine the voluntariness of the inculpatory statements, we must consider the total circumstances under which they were made to the police.

The defendant contends (1) that the statements made by Washington to the police which gave rise to the threatened impeachment were coerced and involuntary because of prolonged interrogation and psychological tricks and pressures intended to induce a confession; (2) that the statements in question were inadmissible because taken in violation of the defendant's sixth amendment right to counsel both (a) in failing to cut off questioning after the defendant indicated a wish to consult with counsel at a critical stage of the proceedings and (b) in the persistent and pro-

longed questioning which resumed after the police knew the defendant was seeking the assistance of counsel; (3) that the defendant's fourth amendment rights were violated when the police seized and used physical evidence from an automobile in which the defendant had a possessory interest, without a search warrant and (4) the defendant's fifth amendment rights were violated when the prosecutor, in the presence of the jury, commented on Washington's failure to testify in his own behalf.

We first consider the voluntariness of the statements made by Washington to the police during the course of their interrogation. Under the "totality of the circumstances" test set out in the decisions of the United States Supreme Court to determine whether an accused has been subjected to such coercive treatment—physical or psychological or both—as to overbear his will and produce a confession which is essentially involuntary, several facets of police conduct, no single one of which is sufficient, may, when combined, act together to create such pressure on the accused as to amount to coercion and produce a confession which is not "voluntary" in that it is not the product of a free will. See *Clewis v. Texas* (1967), 386 U.S. 707, 18 L. Ed. 2d 423, 87 S. Ct. 1338 (prolonged questioning without counsel); *Davis v. North Carolina* (1966), 384 U.S. 737, 16 L. Ed. 2d 895, 86 S. Ct. 1761 (accused isolated and held incommunicado); *Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (prolonged interrogation and threats, denial of counsel and isolation); *Fikes v. Alabama* (1957), 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281 (person of low mentality isolated and threatened); *Reck v. Pate* (1961), 367 U.S. 433, 6 L. Ed. 2d 948, 81 S. Ct. 1541 (19-year-old mental defective—prolonged questioning—evidence of physical abuse).

Our own supreme court has followed the concept of the totality of the circumstances in evaluating the voluntariness of a confession. (See *People v. Simmons* (1975), 60 Ill. 2d 173; *People v. Prim* (1972), 53 Ill. 2d 62.) In reviewing the cases where the totality of the circumstances rather than any single aspect or instance of police misconduct was held to have produced an impermissibly coercive effect on the accused and to have overborne his will, we do not find those circumstances present in this case.

The defendant was arrested at approximately 9 p.m. on March 22. He was interrogated by several police officers from approximately 9:30 p.m. until about 1:20 a.m. During this time he was required to appear in a lineup and to be photographed without his clothing. He was also subjected to a neutron-activation analysis test. At around 1:10 a.m., after he had expressed a desire to discontinue the questioning, he was taken back to his cell. Detective Cronk testified that the defendant did not request to see a lawyer at that session of the interrogation, which ceased shortly after 1 o'clock on March 23. While the total time from defendant's arrest until

he was returned to his cell was about four hours, Detective Salamone, one of the interrogating officers, estimated that only about 2½ hours of this time was spent in actual interrogation of the defendant, the rest of the time being used in taking pictures, administering the neutron-activation test and conducting a lineup. The defendant was served with a complaint about 1:30 a.m., after he was returned to his cell following his interrogation. (It is the defendant's theory, however, that even before the serving of the complaint, any police interrogation should be deemed a "critical" part of the proceedings against him.)

The next morning, about 9:25 a.m., the defendant was again questioned, after again being given his rights under *Miranda*. After signing the waiver form, he was briefly questioned and he then asked to make a telephone call to a lawyer. He was handed a telephone and a telephone directory and attempted to call the public defender, Craig Peterson, but did not get through to him. After some further questioning, following the attempted telephone call, the defendant requested to make another telephone call and he then called his girl friend, although in requesting permission to make the call he had said that he wished to call his mother. Unknown to the defendant, this telephone call was monitored. After some further questioning, the defendant was taken to another room where his taped telephone conversation to his girl friend was played back to him. The defendant was then questioned for two or three hours, and he then again made a request to call a lawyer and he attempted again to call the public defender but again there was no reply. The defendant was asked to take a lie detector test, to which he agreed, but said he wanted to talk to a lawyer first. He then again attempted to call Mr. Peterson and again got no reply. The defendant was then returned to his cell shortly after 1 p.m. According to Detective Gessner of the Rockford police force, he received an assignment to question the defendant about 5:30 p.m. that same day (March 23). He was told by Sergeant Lindquist that Walter Washington "wanted to talk to some detective." He and Detective Cronk then advised Washington of his *Miranda* rights and the defendant signed the waiver form. However, the defendant then said that he did not wish to give a statement but wanted to talk to a priest and a psychiatrist. He was told he would have to wait for a psychiatrist until he got to the county jail but he could probably see a priest that night. The defendant then called his mother. After the defendant talked with her the detective asked him how he felt and the defendant, according to Detective Gessner, hung his head and replied that he felt real bad about the dead boy, his family and his own family. Following this, according to Detective Gessner, the defendant was again briefly questioned and he admitted he had been alone on the night of the robbery, rather than being with another man who had actually held the gun and committed the robbery, as the

defendant had claimed originally. The defendant then stated, according to Detective Gessner, that he would talk to him later but wanted more time to think about it, at which time the defendant was returned to his cell. This interview, according to Detective Gessner, lasted approximately one-half hour. Around 8 p.m. the prison chaplain, Father Wentig, came in and the defendant was brought out of his cell and left alone with the chaplain for approximately 45 minutes. After that, Detective Gessner and Detective Cronk spoke to the defendant and at that time the defendant, after saying he understood his rights, gave Detectives Gessner and Cronk a statement. He then called his mother and following that had a telephone conversation with Attorney Craig Peterson, who advised the defendant not to give the police any further statements. The defendant was then taken back to his cell and there were no further jail interrogations.

As noted above, in determining whether a confession or inculpatory statement is involuntary and therefore inadmissible, the total circumstances surrounding the statement in question must be taken into account. A combination of circumstances, even if they would not be coercive if taken singly, may, in combination, produce intolerable pressure. This is summed up succinctly in the United States Supreme Court case of *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047, where the court said:

> "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g.*, *Haley v Ohio* 332 U.S. 596; his lack of education, *e.g.*, *Payne v. Arkansas*, 356 U.S. 560; or his low intelligence, *e.g.*, *Fikes v Alabama*, 352 U.S. 191; the lack of any advice to the accused of his constitutional rights, *e.g.*, *Davis v. North Carolina*, 384 U.S. 737; the length of detention, *e.g.*, *Chambers v. Florida, supra*; the repeated and prolonged nature of the questioning, *e.g.*, *Ashcraft v. Tennessee*, 322 U.S. 143; and the use of physical punishment such as the deprivation of food or sleep, *e.g.*, *Reck v. Pate*, 367 U.S. 433. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, supra, at 603."

In the case before us, however, it is clear from the detailed recital we have set out as to the circumstances attending the defendant's statement to the police that the defendant was not subjected to impermissibly long periods of interrogation and was not isolated or refused access to friends or relatives. The defendant himself does not contend that he was

physically abused or threatened, that he was not given adequate food or rest. The defendant was 27 years old when he was arrested, and it is quite clear from the record that he is not of low intelligence or unused to police procedures. It is contended, however, that psychological pressures may have induced his confession.

In *Spano v. New York* (1959), 360 U.S. 315, 3 L. Ed. 2d 1265, 79 S. Ct. 1202, the prisoner's will was held to be overcome by impermissible psychological pressure. In that case the defendant was induced to confess after a long and grilling interrogation over a period of several days by the artifice of having a friend whom he trusted pretend to be in trouble with the authorities and possibly accused of the same crime and asking the defendant to confess so as to clear the friend. The accused did not have the advice and support of counsel. It is clear that the *Spano* case involved psychological pressure far more severe than the defendant here was subjected to.

When the defendant made his telephone call to his girl friend, it was, unknown to him, monitored and a few minutes after completing the call he was taken to another room and the recorded telephone conversation was read back to him. We do not think this was sufficient to overcome the defendant's will. After the lineup he participated in, the defendant was not told that he had not been positively identified and, in fact, one of the viewers had identified another person as the robber. A remark by one of the officers gave the impression that the defendant may have been identified as the robber. It is claimed that the police also played on the defendant's sympathies and emotions by talking to him immediately after he had had a telephone conversation with his mother. None of these actions by the police, however, is, in our opinion, so devastating as to overbear the defendant's will and make him confess to the crime.

The defendant contends that the repeated questioning over a period of 24 hours plus the psychological ploys of the police, the withholding of favorable information about the lineup, plus the confrontation concerning the monitored telephone conversation with his girl friend, all done while counsel was being denied to him, amounted to such a totality of coercive circumstances as to render his statement to the police involuntary and thus impermissible for any purpose, including impeachment, under the fifth and fourteenth amendments to the United States Constitution.

■■ We do not agree with this evaluation of the total circumstances preceding the inculpatory statement the defendant made to the police. Neither singly nor in combined effect do the facts and circumstances related above which preceded the defendant's questioning by the police amount to such coercion as to overcome the defendant's will and render his statements involuntary under constitutional precepts. Most differences,

in the law as elsewhere, are a matter of degree. In the case before us, the degree of pressure induced by the questioning of the defendant, together with the psychological effect of the withheld information, after the lineup and the confrontation with his own telephone conversation, even in the absence of counsel, did not constitute an impermissibly coercive situation. The questioning was not excessively prolonged, the defendant was not physically mistreated or denied food or rest, and the psychological pressures he was subjected to were not of such a character as to produce an involuntary confession. We hold, therefore, that apart from considerations raised by the sixth amendment in that the defendant was without counsel during his interrogation, the circumstances were not coercive to the extent of rendering the defendant's inculpatory statements inadmissible because they were involuntary.

The defendant contends, however, that even in the absence of other coercive circumstances which would render a confession involuntary because the person's will was overborne, an inculpatory statement is inadmissible for any purpose if taken in violation of the sixth amendment right to counsel as that right has been explicated under recent United States Supreme Court cases. The defendant contends such violation occurred in this case, citing a number of cases to support his contention. See *Fare v. Michael C.* (1979), 442 U.S. 707, 61 L. Ed. 2d 197, 99 S. Ct. 2560; *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232; *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *United States v. Mandujano* (1976), 425 U.S. 564, 48 L. Ed. 2d 212, 96 S. Ct. 1768; *United States v. Ash* (1973), 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568; *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199; *Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860.

Specifically, the defendant says that if a statement is given to the police during their interrogation of him by an individual on whom suspicion has been centered after such individual has requested the assistance of counsel and such request has been ignored or frustrated by the authorities, then the results of further interrogation without counsel are not simply the fruits of a *Miranda* violation making them inadmissible as substantive evidence but, being in violation of the sixth amendment as amplified by the due process clause of the fourteenth amendment, such statements are inadmissible even for impeachment purposes.

■■ While general statements in some of the cited United States Supreme Court cases dealing with uncounseled inculpatory statements made while in police custody lend support to the proposition above stated (see, for example, *Culombe v. Connecticut*; *Miranda v. Arizona*; *Brewer v. Williams*), these cases did not deal with the distinction between the use of

such statements directly as substantive evidence and their use for impeachment purposes to counter alleged perjury, as in *Harris v. New York*. It is obvious that a distinction must be made as to the sixth amendment implications arising from the case before us and the holding in *Harris*, if we are to give any consideration to the contention that the facts of this case make the statements inadmissible even for impeachment. If *Harris* governs this case, then the sixth amendment ground for reversal is not tenable. It may be argued that there is a difference between, on the one hand, failing to advise the defendant of a right to appointed counsel and then questioning him further and, on the other hand, the resumption of questioning after the defendant had expressed a desire for assistance of counsel and failed to reach counsel by telephone, the only means available to him. Is it, however, a significant difference? The statements in both cases resulted from police interrogation and in both cases a sixth amendment question was involved—a right to be informed as to the availability of court appointed counsel and the right to cut off questioning in the absence of counsel. Both rights were violated. Both were *Miranda* violations, but the *Miranda* case is merely a statement or summary of certain constitutional safeguards which were recognized long before *Miranda* as stemming from the Bill of Rights and the implementing due process clause of the fourteenth amendment. (See *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019; *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684; *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, and other cases cited in *Miranda*.) There is, of course, the possibility that had Harris been properly advised, he would have chosen to be represented by counsel and might have avoided making the incriminating statements in question. But, on the other hand, there is also the good possibility that Washington would have been convicted without the use of his admissions to the police. We cannot weigh and balance the constitutional deprivations in the two cases without impermissible speculation. We hold that regardless of the factual differences between the two cases, the case before us, so far as the sixth amendment violation is concerned, is controlled by *Harris*, and under that decision the defendant's inculpatory statements, even though taken in violation of *Miranda* strictures, were admissible to impeach the defendant's testimony if at trial he testified contrary to such statements. Thus, whether the defendant's sixth amendment rights were violated *per se* by police interrogation while uncounseled and in custody, or whether his right to counsel was directly and specifically violated by the resumption of questioning after he told the police he wished to see a lawyer, the case is not distinguishable from *Harris* in its result. That is to say, that the defendant's inculpatory statements were admissible to impeach his testimony if the defendant

testified at trial in a manner inconsistent with those statements. Cases reaching the same result are *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (where, as in this case, *Miranda* warnings were given but the defendant was questioned after counsel was requested but before counsel arrived); *United States v. Havens* (1980), ___ U.S. ___, 64 L. Ed. 2d 559, 100 S. Ct. 1912.

■■ A further contention is made by the defendant that his fourth amendment rights were violated when the police searched his girl friend's car in which he claims to have had a possessory interest, while it was parked near the scene of the robbery—without a search warrant—and then used the identification found therein consisting of a wallet and finger prints as a basis for further questioning the defendant. The defendant's girl friend testified that the defendant drove her to work on the morning of the day of the crime and then drove away in the car. On this basis, the defendant claims he was a bailee of the car having a possessory interest therein, and he therefore attempts to establish a right to privacy in the undisturbed possession of the car.

While the defendant recognizes the force of the decision in *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, to the effect that the fact that the defendants were legitimately in the automobile did not, in view of the lack of a property or possessory interest, give them a legitimate expectation of privacy in the automobile, he claims his right is distinguishable as deriving from the legal relationship of bailment. The defendant contends that, in line with the implication of even the majority opinion in *Rakas*, persons having a possessory interest in a place, as did Jones in *Jones v. United States* (1960), 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, are recognized as having a legitimate expectation of privacy therein, and in this case the defendant contends that since he had possession of the car with the consent of his girl friend, the owner, he had a right under the fourth amendment to be free of warrantless search and seizure of the car. The defendant claims his fourth amendment right as a bailee of the car, but the evidence merely indicated that he drove the owner to work and then drove away again. While it is logical to assume that the defendant was driving the car with the owner's permission, his bailment right, if any, would not under the circumstances extend beyond his actual use and occupation of the car, nor do we think it extended to an illegal use, such as using the car for reconnoitering a place of intended robbery and escaping therefrom. According to the testimony of the defendant, as well as other witnesses, he abandoned the car on the street and fled the scene after the robbery, leaving the car unlocked and with the keys in it. At that point we can see no legitimate interest, possessory or otherwise, which the defendant had in the car and, of course, he certainly

had no expectation of privacy in an unlocked, abandoned auto, with the ignition key still in it. (See *Rawlings v. Kentucky* (1980), ___ U.S. ___, 65 L. Ed. 2d 633, 100 S. Ct. 2556.) At the time the police searched the car, a day or two after the robbery, the defendant no longer had a possessory interest in it, in view of his abandonment of the car, such as he would need for a bailment, nor of course would he have any expectation of privacy in the car such as the defendant had in the apartment of his friend in the *Jones* case. It would appear to us that whatever fourth amendment rights a nonowner of an automobile might have while he was in possession of it, either driving it or having parked it and locked it, with the key in his pocket and intending to return to it, the defendant here, having left the car unattended and unlocked while he fled the scene of the crime, lacked any fourth amendment rights either as a bailee or an occupier of the automobile. We therefore reject the defendant's fourth amendment contention with regard to the search of the automobile. Since a fifth amendment claim is associated with and depends on the fourth amendment right in this case, the fifth amendment claim associated with the search of the car may also be disregarded.

Lastly, the defendant asserts that he was prejudiced by a remark made by the prosecutor at the close of the case, which the defendant asserts was intended as a comment on the defendant's failure to testify. The exact colloquy was:

"MR. GAZIANO [defense counsel]: At this time, the defense would rest, Your Honor.

THE COURT: Thank you, counsel. Anything further, Mr. Gemignani?

MR. GEMIGNANI [Assistant State's Attorney]: I would like to have 5 minutes to think about that Judge, if I may. I'm a little bit surprised. I think—

MR. GAZIANO: (Interjecting) Judge, I don't think we need the intrajudicial comments of Mr. Gemignani.

THE COURT: You shall have your 5 minutes, Mr. Gemignani.

MR. GEMIGNANI: Thank you.

THE COURT: I'll ask the jury to be taken to the jury-room briefly. * * *."

Defense counsel moved for a mistrial on the basis of this colloquy and that motion was denied. In this appeal, the defendant argues that this brief passage was an impermissible comment on the defendant's failure to testify. We do not so regard it. In the arguments on the defense motion for a mistrial, the prosecutor explained that the decision of defense counsel to rest took him by surprise and he wanted a few moments to consider whether he would need to use other witnesses he had expected to

use in rebuttal and which he might now not need. He said that he needed time to make that decision and denied that in saying that he was surprised that he intended to reflect on the defendant's failure to testify.

It is our opinion that the State's Attorney gave a reasonable explanation of his remark that he was surprised and no implication of an ulterior motive from that remark is justified. We agree with the trial court's rejection of the motion for a mistrial based on this fragment of conversation at the close of the trial.

The judgment of the circuit court of Winnebago County is affirmed.

Judgment affirmed.

SEIDENFELD, P. J., and VAN DEUSEN, J., concur.