**UNITED STATES of America, ex rel. William ADKINS, Petitioner-Appellant,**

v.

**James GREER and Attorney General of Illinois, Respondents-Appellees.**

**No. 84–2641.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1986.

Decided May 27, 1986.

---

Alvin M. Binder, Binder Milner & Keyes, Jackson, Miss., for petitioner-appellant.

Mark L. Rotert, Asst. U.S. Atty., East St. Louis, Ill., for respondents-appellees.

Before CUDAHY, COFFEY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

William Adkins appeals from the district court's denial of his petition for a writ of habeas corpus. He argues that the state trial judge should not have ruled that inculpatory statements obtained by police in violation of Adkins' constitutional rights were admissible to impeach his testimony at trial. He also asserts that the prosecutor's closing argument violated his privilege against self-incrimination by calling attention to his failure to testify. We affirm.

## I.

William Adkins was arrested for murder and robbery on June 14, 1978. Prior to the arrest he had twice voluntarily spoken with the police about the murder, once promising to go to the police station for questioning. After his arrest and while on the way to the police station, the police asked Adkins why he had not come to the police station as promised. He responded that his

wife had just served him with divorce papers. He was not advised of his *Miranda* rights before this questioning en route.

At the police station Adkins was questioned by Officer Doty, one of the arresting officers. He still had not been given his *Miranda* rights. According to Adkins, he was asked whether he killed the victim and whether he knew who did. He testified at the suppression hearing that he answered "no" to these questions. Doty also asked about Adkins' wife. He became highly upset and emotional, and the interview ended. Adkins then met with Assistant State's Attorney Sabbatini, who read him his *Miranda* rights for the first time. He responded by saying, "my name is William Adkins, my attorney's name is Leonard Karlin," and he showed Sabbatini Karlin's business card. When Sabbatini asked whether he wished to talk, Adkins responded in the same manner. The questioning ended and Adkins was sent to the lockup.

While in his cell the night of June 14 Adkins, "upset at being locked up for a murder I didn't do, and my family problems," Trial Transcript at 291, took off his shirt and jacket and set them on fire. The fire was put out and Adkins was transferred to a new cell. In the new cell, Adkins tried to hang himself with his tee shirt. Adkins testified at the suppression hearing that he was then sent to the women's lockup (although he saw no women there) and left without his clothes for one or two hours; a prison official testified that under these circumstances prisoners are provided paper smocks.

Adkins was then transferred to still another cell and his clothes returned. At this point, he was seen hitting his head against the bars of the cell. He also made a telephone call to his lawyer, who advised him "to keep [his] mouth shut." Tr. at 299. Three different pairs of police officers passed by his cell and questioned him: he said nothing to the first; denied the murder to the second; the third only asked him the basis of his arrest. The district court, in reviewing the evidence, stated that "[t]he record reveals that no sustained questioning occurred on the night of June 14 ... [nor was] Adkins ... kept up late or questioned vigorously or over long periods." *United States ex rel. Adkins v. Greer*, No. 83–C–1610 (N.D.Ill. Aug. 22, 1984), at 10.[1]

The next morning, June 15, Adkins was questioned for about half an hour by Officer Johnson, the other arresting officer. Adkins' and Johnson's testimony conflict as to whether Adkins was again read his *Miranda* rights. Adkins testified that when Johnson started talking about Adkins' wife he became upset. When Johnson asked him about a fight the couple had had six weeks earlier, during which Adkins allegedly stabbed her with scissors, Adkins became "extremely upset" and started "crying and breathing very hard." Tr. at 196. Johnson asked Adkins whether he wanted to see his wife. Adkins testified that "I told him what was the catch to it, and he told me he would call her down here and let me talk to her if I cooperated with him...." Tr. at 311.

Later in this conversation, which lasted between fifteen and thirty minutes, Adkins was asked about Darlene Cornelius, the murder victim. According to Johnson, Adkins said, "I didn't mean to kill that girl." After he made this inculpatory statement Adkins, claiming that Johnson was putting words in his mouth, began choking himself with his hands. Adkins then showed Johnson his attorney's card and asked him to call Karlin.

Later that morning Adkins spoke with Assistant State's Attorney Simpkin. When Simpkin entered the room Adkins showed him Karlin's card and said, "That's my lawyer's card and I would like for him to be here." Tr. 319.

1. Adkins also testified that he was physically mistreated by the police (who he claimed hit him in the thigh with a baseball bat) and by another prisoner (who he claimed beat him up in the lockup that night). The state trial court found that Adkins had not been subjected to physical violence and, after reviewing the evidence, the district court concurred in this finding.

Before Adkins' trial, his attorney moved to suppress the inculpatory statement made to Officer Johnson. The trial court found that Adkins' Sixth Amendment right to counsel had been violated[2] and ordered the statement suppressed. Adkins then moved *in limine* for an order barring the state from introducing the statement for any reason, should Adkins elect to take the stand. The trial court determined that the statement was freely and voluntarily given and thus ruled that the state could use it for impeachment purposes.

After a jury trial, at which he did not testify, Adkins was found guilty and sentenced to concurrent terms of seventy years for murder and sixty years for armed robbery. The Illinois Appellate Court affirmed the convictions in *People v. Adkins*, 105 Ill.App.3d 1201, 64 Ill.Dec. 449, 439 N.E.2d 1114 (1982). In particular, the appellate court evaluated the factual record and held that Adkins was not "subjected to such coercion as to overcome his will and to render his statements involuntary under constitutional precepts." *Id.* at 7.

Appearing *pro se*, Adkins sought a writ of habeas corpus from the district court for the Northern District of Illinois. There, Adkins argued (1) that his statement was involuntary and could not be used for impeachment purposes; (2) that the inculpatory statements were made after questioning pursued in disregard of his request for a lawyer and that statements so obtained are not admissible for impeachment purposes; and (3) that he had understood the trial judge's ruling to mean that if he were to testify the statement could be read to the jury regardless of its impeachment value and that this had chilled his right to testify in his own behalf. On a motion for summary judgment, the district court ruled (1) that the inculpatory statement was volun-

tary; (2) that the statement was therefore admissible for impeachment purposes under *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); and (3) that the trial court's ruling on limited admissibility was proper and not misleading. Adkins appeals only the district court's second ruling, the admissibility for impeachment purposes of his inculpatory statement. Before we reach this issue, however, we must address a threshold argument advanced by the State.

### A.

The State contends that Adkins is not entitled to review of the state court's *in limine* ruling because he elected not to testify and therefore no impeachment was attempted. It argues that if the statement was not in evidence Adkins was not injured by it and that it is mere speculation that Adkins would have taken the stand in the absence of an adverse ruling on the admissibility of his inculpatory statement. The arguments advanced are very similar to those made in *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), in which the Supreme Court held that impeachment by prior statements made to a grand jury under a grant of immunity would violate the defendant's Fifth Amendment right not to be compelled to incriminate himself. The New Jersey trial court had ruled *in limine* that the defendant could be so impeached, and the defendant did not testify. The Supreme Court found that the merits of Portash's appeal could be reached because the New Jersey appellate court had considered the merits properly before it, and federal law did not prohibit New Jersey from following this procedure. *Id.* at 454–56, 99 S.Ct. at 1294–95. Here, too, the Illinois Appellate

---

**2.** The Illinois courts and the district court all ruled that the police's conduct in eliciting Adkins' statement violated his Sixth Amendment right to counsel. This is incorrect (as appellant himself points out, *see* Appellant's Brief at 19 n. 2) because Adkins' Sixth Amendment rights had not yet attached. *See, e.g., Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) ("a person is entitled to the

help of a lawyer at or after the time *judicial proceedings* have been initiated against him") (emphasis supplied). As noted *infra*, the Fifth Amendment protection against self-incrimination includes the right to counsel at custodial interrogations, and it is this right that Adkins did not receive. This distinction is discussed in *Michigan v. Jackson*, — U.S. —, 106 S.Ct. 1404, 1407–08, 89 L.Ed.2d 631 (1986).

Court found this question to be properly before it, asking whether "the threat to use the statement for impeachment purposes, result[ing] in his failure to testify, deprived him of a fair trial." *People v. Adkins,* 105 Ill.App.3d 1201, 64 Ill.Dec. 449, 439 N.E.2d 1114 (1982), at 2. Similarly, although the defendant did not testify, in *People v. Washington,* 90 Ill.App.3d 631, 45 Ill.Dec. 837, 413 N.E.2d 170 (1980), *cert. denied,* 454 U.S. 846, 102 S.Ct. 162, 70 L.Ed.2d 132 (1981), the Illinois Appellate Court heard the argument that the threat of using an allegedly inadmissible statement deprived him of a fair trial. There the court accepted an affidavit from the defendant stating why he did not testify. *Id.,* 45 Ill.Dec. at 633, 413 N.E.2d at 172. Thus, "federal law does not insist" that Illinois erred in reaching the merits of Adkins' claim despite the fact that he did not testify. *Portash,* 440 U.S. at 456, 99 S.Ct. at 1295. *Cf. Brooks v. Tennessee,* 406 U.S. 605, 611 & n. 6, 92 S.Ct. 1891, 1894 & n. 6, 32 L.Ed.2d 358 (1972) (Tennessee statute may violate the right against self-incrimination although defendant never took the stand because it "imposed a penalty for petitioner's initial silence, and that penalty constitutes the infringement of the right.").

Despite the State's contention, none of this is altered by *United States v. Luce,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). In *Luce,* a defendant on trial on federal drug charges moved *in limine* to preclude the United States from using a prior state conviction to impeach him were he to testify. The district court denied the motion on the ground that the prior conviction was permissible impeachment evidence under Federal Rule of Evidence 609(a). The defendant did not take the stand and was found guilty. The Supreme Court held that since Luce did not testify an appellate court should not consider the contention that the district court erred by not balancing the probative value of the prior conviction against its prejudicial effect, as required by Rule 609(a).

■ *Luce* presents a different case from that before us now. First, the Supreme

Court in *Luce* was concerned with the practical problems involved in reviewing the district court's ruling:

> A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context. This is particularly true under Rule 609(a)(1), which directs the court to weigh the probative value of prior convictions against the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable where, as here, the defendant does not testify.

105 S.Ct. at 463. In William Adkins' case, however, the determinative questions are legal, not factual. A reviewing court's concerns about ruling in a factual vacuum are not present. Whether or not Adkins took the stand, the question before the appellate court remains whether a confession elicited in violation of a defendant's Fifth Amendment rights may ever be used for impeachment purposes. Second, the *in limine* ruling in *Luce* was on "a question not reaching constitutional dimensions," *id.* at 464, and the distinction drawn with *Portash* and *Brooks* in that case suggests a different "calculus of interests," *id.* (Brennan, J., concurring). Third, the case before us involves collateral review of state procedures while *Luce* involved a federal court's *in limine* ruling. *See Portash, supra.* Thus we may properly reach the merits of Adkins' appeal.

### B.

■ Adkins' argument that the trial court should not have found his inculpatory statement admissible to impeach trial testimony rests entirely on his contention that *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), created a safeguard analytically distinct from and appreciably stronger than that created by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He concedes that *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), forecloses an argument that statements taken in violation of *Miranda* are inadmissible for im-

peachment purposes, *see id.* at 224, 91 S.Ct. at 645 ("It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."). He urges, however, that we not "extend" the rule of *Harris* to "*Edwards* violations." [3] No "extension" is necessary, however, because *Harris* is clearly determinative of this case.

In *Miranda* the defendant was subjected to custodial interrogation without being informed that he had the right to remain silent and the right to have counsel present; in *Edwards* the defendant was told that he had the right to counsel, had requested counsel but was interrogated before he saw his lawyer. The *Edwards* decision, that once the defendant had asserted his right to counsel there had to be a knowing and voluntary waiver of that right before questioning could continue, was a ruling on the enforcement of *Miranda* rights. It stemmed from the Fifth Amendment's right to counsel at custodial interrogations, a right articulated in the *Miranda* decision itself, 384 U.S. at 469–73, 86 S.Ct. at 1625–27. *Miranda* held that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628. *Edwards* created a further prophylactic rule to enforce the constitutional mandate of *Miranda:* "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available, unless the

accused himself initiates further communication...." 451 U.S. at 484–85, 101 S.Ct. at 1885. *See Michigan v. Jackson,* 106 S.Ct. at 1406 ("*Edwards* established a bright-line rule to safeguard pre-existing rights....").

Thus, the rights safeguarded in *Miranda* and *Edwards* are the same and *Harris* should apply in both circumstances. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), pre-dated *Edwards* but had facts very similar to both *Edwards* and the instant case. In *Hass,* the court found "no valid distinction" between its facts and those of *Harris* that would prevent the application of *Harris* to it, *id.* at 722, 95 S.Ct. at 1221, and noted that "[t]he effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth," *id.* at 723, 95 S.Ct. at 1221. *See also People v. Washington,* 90 Ill.App.3d 631, 45 Ill.Dec. 837, 413 N.E.2d 170 (Ill.App.1980), *cert. denied,* 454 U.S. 846, 102 S.Ct. 162, 70 L.Ed.2d 132 (1981) (following *Hass* on similar facts).

Adkins argues that *Hass* may be distinguished because it was decided before *Edwards* announced a new rule. But chronology is material only if *Edwards* changed the law in some way that would affect the rationales of *Harris* and *Hass.* In those cases, "the Court weighed the incremental deterrence of police illegality against the strong policy against countenancing perjury," *New Jersey v. Portash,* 440 U.S. 450, 458, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979), and found the latter to weigh heavier in the balance. No suggestion is made why this calculus would turn out differently after *Edwards.*[4] *See also People v.*

---

3. There is no bar to applying *Edwards* retroactively because Adkins' case was on direct review in the Illinois courts when *Edwards* was decided. *Shea v. Louisiana,* 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985).

4. Adkins suggests that a person who has requested counsel is in need of greater protection than someone who has not been advised that he

has a right to counsel. Thus he argues that *Edwards* created a stronger prophylactic rule to safeguard an accused in a more precarious situation. He stresses the lack of deterrence that would flow from allowing statements taken in violation of *Edwards* into evidence to impeach credibility, but he does not explain why police would be more willing to violate the *Edwards*

*Esters,* 417 Mich. 34, 331 N.W.2d 211, 218–19 (1982) (finding no reason not to apply the *Harris* rule to an *Edwards* violation).

■ We hold therefore that it was proper to admit Adkins' inculpatory statement for the limited purpose of impeachment, providing that it was voluntary and not coerced. *See Portash,* 440 U.S. at 459, 99 S.Ct. at 1297; *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Harris,* 401 U.S. at 224, 91 S.Ct. at 645.[5] The district court reviewed the facts in the record independently and determined that under the "totality of the circumstances" Adkins' statement was voluntary. *Adkins,* slip op. at 5–16.

## II.

Adkins' second set of arguments concern statements made by the prosecutor during her closing remarks to the jury. He alleges that the prosecutor violated his Fifth and Fourteenth Amendment rights against self-incrimination by improperly drawing the jury's attention to the fact that he did not testify. The parts of the closing in question went as follows:

> MS. NOREK: ... Those were the facts you heard from the witness stand and you are the one to make the inference, the inference, when someone is caught in recent, unexplained possession of property that it infers that he did the crime and you can infer he did the crime and you can infer he did the crime without anything more. It is one heck of an inference and it is so strong that you will be instructed in black and white that that is the case. *That is why it is so critical that the defense should have put witnesses on the stand if they could have.*
>
> Now, granted—
>
> MR. KLING: Objection, it is not our burden.

THE COURT: I would sustain the objection. Ladies and gentlemen, you'll be advised again the defense need not prove anything.

MS. NOREK: Absolutely. And, your Honor, I didn't mean to imply anything different.

> The defense need not prove anything but do you know that [*sic* ] the corollary theory on that is, ladies and gentlemen? You have heard and you will hear again the only evidence in this case is the evidence that came from this stand, from stipulations and things you heard here in court, that is the only evidence in this case. *Granted, the defense need not do nothing, but what posture is the case in at that point?*
>
> MR. KLING: Objection, Judge.
>
> MS. NOREK: *The State's evidence is the only evidence in the case.*
>
> MR. KLING: The same objection, she is shifting the burden.
>
> THE COURT: Again, there is no burden on the defendant to prove his innocence.
>
> MS. NOREK: Absolutely not, but they are stuck with the case as the case is, they are stuck with the evidence as it is from the stand, they are stuck with the evidence because that is the truth and they could do nothing about it. *They could have brought in people to say Terry Taylor is a liar and has been known for lying. They could have brought in people to say his sister is noted for lying, they could have brought in people to say Clifton DeJean has a motive for lying.* Why didn't they? Because there is no such person, and you better believe if there was they would have put them on the stand.
>
> \*    \*    \*    \*    \*    \*
>
> MS. NOREK: ... Ladies and gentlemen of the jury does that explain his possession of that property? *We have heard*

rule than *Miranda* itself (where the statement is admissible for impeachment as well).

**5.** Adkins' suggestion that the evidence be inadmissible for impeachment because the state failed to show a knowing and intelligent waiver of the right to counsel thus misses the point.

The emphasis on waiver in *Edwards* concerned whether *Miranda* had been violated. The State concedes that it cannot make this showing and that it violated Adkins' Fifth Amendment rights during the June 15 interrogation. The key inquiry at this point is into voluntariness.

*no explanation, they have put no witnesses on the stand to inferentially tell us what happened.*

MR. KLING: Objection to shifting the burden.

THE COURT: Pardon me?

MR. KLING: Object to Ms. Norek once again shifting the burden. The burden is on the People to prove the charges, not on the defendant to prove his innocence.

MS. NOREK: Ladies and gentlemen, you will have the instructions—

THE COURT: The jury is so advised again that the defense need not prove anything.

MR. KLING: Thank you.

MS. NOREK: *There is no reasonable explanation and none has been given.*

\* \* \* \* \* \*

MS. NOREK: ... Ladies and gentlemen of the jury, if that wasn't the case why say we rest? *I mean, now, that is something that is really easy to rebut.* I mean, when I have a witness on the stand that is going to put his oath on the line and say, I saw him wearing those pants for two weeks straight before the crime and then he stopped wearing them, *then you have to rebut it. I mean, all you need is one witness—*

MR. KLING: Same objection, Judge.

MS. NOREK: *—to say that I saw William Adkins a week and a half before the crime and he didn't have on the dirty, beige pants—*

THE COURT: I would sustain the objection and ask the jury to disregard it as the defense need not prove anything.

MS. NOREK: *Absolutely not, ladies and gentlemen, but you are stuck with unrebutted, uncontradicted testimony that Adkins was wearing those pants for two weeks before the crime and he got rid of them.*

Appellant's Brief at 55–57, *quoting* Trial Transcript at 1567–69; 1578–79; 1585–86 (emphasis supplied).

After the closing, Adkins moved for a mistrial on the ground that the prosecutor's closing deprived him of a fair trial by shifting the burden to the defense. The trial court denied the motion. The Illinois Appellate Court affirmed, ruling that the comments were improper but had not prejudiced Adkins. *People v. Adkins,* 105 Ill. App.3d 1201, 64 Ill.Dec. 449, 439 N.E.2d 1114 (1982), at 9–10. The district court agreed with the Illinois court on this point, *United States ex rel. Adkins v. Greer,* No. 83–C–1610 (Aug. 22, 1984), at 20–21, and also suggested that Adkins' *pro se* habeas corpus petition alleged a violation of his Fifth and Fourteenth Amendment right against self-incrimination in that "a prosecutor's comments on the uncontradicted nature of the state's case are most commonly classified as such a violation when, as here, the accused has chosen not to testify," *id.* at 21. The district court then considered this second issue and concluded that "the prosecutor did not make references that would naturally and necessarily draw the jury's attention to Adkins' failure to testify." *Id.* at 22. Adkins has chosen to appeal only the second issue to this court.

■ A direct comment by a prosecutor on a defendant's failure to testify violates the Fifth Amendment's privilege against self-incrimination (as applied to the States through the Fourteenth). *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *See also, e.g., United States v. Rodriguez,* 627 F.2d 110 (7th Cir. 1980). We have also held that a reference to the State's evidence as "uncontradicted" or "unrefuted" may violate the nontestifying defendant's Fifth Amendment rights if the remark has "the natural and necessary effect of calling the attention of the jury to [the defendant's] failure to testify." *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied sub nom. Lysczyk v. United States,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968). *Accord United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1300 (7th Cir.1985); *United States v. Hastings,* 660 F.2d 301, 303 (7th Cir.1981), *rev'd on other grounds,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *United States v. Bartemio,* 547 F.2d 341, 346 (7th Cir.1974). This would occur, for instance,

where the defendant was the only person who *could* rebut the evidence to which the state referred. *Compare Hastings,* 660 F.2d at 301 (prosecutor said no one had denied rapes occurred; only defendants could do this), *with Rothman,* 567 F.2d at 751 (other witnesses could rebut evidence as to telephone numbers). Subject to these Fifth Amendment limitations, the prosecutor may comment on the failings of the defense.[6]

■ Adkins divides the prosecution's comments into three groups: direct references to his failure to testify; indirect references; and references to the State's case as unrefuted. This last group consists of the prosecutor's statement that "The state's evidence is the only evidence in the case," and a rhetorical question, "Ladies and Gentlemen, if that wasn't the case, why say we rest?". We do not believe that these general statements would "naturally and necessarily" remind the jury that Adkins did not testify. What Adkins refers to as the direct and indirect references relate to one piece of evidence: testimony that Adkins was found in possession of property belonging to the victim. First, the prosecutor noted that this testimony was unrebutted and said that "the defense should have put witnesses on the stand if they could have." Adkins claims that the phrase "if they could have" is an "unequivocal reference to the defendant's legal infirmity," the fact that he could not testify without risking the admission of his inculpatory statement. Appellant's Brief at 29. We cannot agree. Especially in view of the fact that the prosecutor said "witnesses" (in the plural), we think that the natural inference is that she meant "if they had any favorable witnesses."

There is a closer question with this statement and another to which Adkins objects —"[D]oes that explain his possession of the property? We have heard no explanation, they have put no witness on the stand to inferentially tell us what happened." These might be indirect references to the type of rebuttal evidence that only Adkins could give. This is Adkins' strongest argument, but, although the matter may not be free from doubt, we do not believe that his silence at trial is the "natural and necessary" inference to be drawn from these remarks. This case is not like *United States v. Buege,* 578 F.2d 187 (7th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978), where the unrebutted testimony was about the contents of a telephone call between the government witness and the defendant. Nor is it like *Hastings, supra,* where the unrebutted testimony was that of victims that rapes had occurred, or *Burke, supra,* which involved a conversation between a prosecution witness and the defendant. Unlike those cases, it is not hard to imagine that others besides Adkins might have knowledge of his possession of the property, especially since he was not keeping it at his home at the time it was found. Thus, we hold that, although some were problematic, none of the prosecutor's comments to which Adkins objects violated his Fifth and Fourteenth Amendment privilege.

The judgment of the district court is AFFIRMED.

---

6. As noted *supra,* the prosecutor also may not imply that the defense carries or shares the burden of proof. The district court found that the prosecution had improperly suggested that Adkins must prove his innocence, but it also found that the judge's corrections and the jury instructions were clear enough that no prejudice resulted. Adkins has not appealed this ruling.