UNITED STATES of America ex rel. Raymond BURKE, Petitioner-Appellant,

v.

James GREER, Warden, and Attorney General of the State of Illinois, Respondents-Appellees.

UNITED STATES of America ex rel. David OLBROT, Petitioner-Appellee, Cross-Appellant,

v.

Kenneth McGINNIS and Neil F. Hartigan, Respondents-Appellants, Cross-Appellees.

Nos. 84–1430, 84–1343 and 84–1481.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1985.

Decided March 13, 1985.

James Gordon (Student), Northwestern Univ. Legal Clinic, Lori Froeling (Student) Univ. of Chicago, Legal Clinic, Chris Gair (Student) (argued) Gary H. Palm, Mandel Legal Aid Clinic, Chicago, Ill., for petitioners-appellants.

Scott Graham, Chicago, Ill., for respondents-appellees.

Before CUMMINGS, Chief Judge, and BAUER and POSNER, Circuit Judges.

BAUER, Circuit Judge.

The two cases captioned above involve the separate petitions for writs of habeas corpus of two co-defendants, both of whom were convicted of aggravated battery, attempted armed robbery, and attempted murder in a joint jury trial in an Illinois state court. Raymond Burke's petition was denied by Judge Plunkett in the Northern District of Illinois; David Olbrot's petition was granted by Judge Baker in the Central District of Illinois. Because both petitioners challenge the same prosecutorial closing argument as so prejudicial as to have denied them their constitutional right to a fair trial, we consolidate the cases here and issue one opinion in which we find that the prosecutor made constitutionally impermissible indirect references in his closing argument to the defendants' failure to testify. Judge Baker's order that a new trial for Olbrot take place within 120 days of the mandate reaching his court is affirmed. On remand Judge Plunkett should issue the writ ordering the release of defendant Burke unless he is tried within the 120-day time limit of the writ.

## I. FACTS

### A. The Incident

On October 30, 1976, two masked men attempted an armed robbery at Musket & Henricksen Drug Store in Skokie, Illinois. The pharmacist on duty from midnight until 8 a.m. at the drug store was an off-duty Chicago Police Officer, Edward Thun. Thun was an investigator assigned to the Area 6 Robbery Division of the Chicago Police Department who worked part time at the drug store. At 2 a.m. an acquaintance of Thun's, Floyd Hannum, an investigator for the Secretary of State's Office, came in to pick up two prescriptions. Hannum then remained in the store behind the counter conversing with Thun. Hannum had been awake for 21 hours at the time of his visit to the pharmacy.

At trial, Thun testified that at 2:45 a.m. one man, allegedly Burke, wearing a Halloween mask that covered his face, approached Thun, drew a .38 caliber revolver, and ordered Thun away from the cash register. As he moved away, Thun grabbed the man's gun and a struggle ensued. Thun hit the man and his mask became dislodged so that Thun could no longer see the man's eyes. At that point, Thun was shot in the chest by the second man, who was positioned at the end of the aisle, eight

to ten feet away. The second man, allegedly Olbrot, wore a bag over his head with holes cut out over the eyes and mouth. Thun fell to the floor but remained conscious.

Hannum testified at trial that he also saw two men, one with a rubber face mask and one with a plastic bag over his face. Hannum saw Thun wrestling with the man wearing the mask. When he heard the shot, Hannum ran around the prescription counter behind which he had been standing. Hannum observed Olbrot standing in a crouched position, approximately 20 feet away, holding a gun in his hand. Hannum observed Olbrot for only a few seconds, but he testified that the bag over the man's face had shifted almost to his nose so that Hannum saw a mustache.

Hannum testified that both men ran from the drug store and he pursued them. Hannum turned a corner before he reached an aisle leading to the door through which the two men were leaving. At the end of the aisle, Hannum fired his weapon at the two men as they were opening the door. Hannum thought he had wounded Olbrot, but was not sure. Hannum testified that he was again able to see the face of the second man because the bag had moved upward. Hannum also testified, however, that only Burke turned around to fire at Hannum as they were opening the door. Hannum did not see the men outside the drug store. From the corner he saw two people running down the street. They had been customers in the drug store when the assailants first entered.

Skokie police officer Robert Heelan, responding to a call about the drug store shooting, attempted to intercept a green Pontiac Firebird heading east on Main Street away from the drug store by making a roadblock with his squad car. The approaching car slowed down but did not stop for the roadblock. Heelan testified that he was able to see the driver through the driver's window, however, before the car sped off. The car was 20 feet from Heelan when he saw the driver. The intersection was lit by a streetlight and a dim light from a closed restaurant nearby. The driver's window was rolled down and Heelan was within four feet of the car as it sped by. Heelan saw only one person in the car and identified the driver as Burke. Heelan gave chase but lost the car in Evanston. It was found in Chicago the next day, and Heelan identified it as the car he had chased. The car was registered to Olbrot and a bag similar to the bag worn by Olbrot was found in the back seat. A .38 caliber revolver was found near the car.

### B. Identification of Olbrot

Thun never attempted to identify either suspect. Both Heelan and Hannum, however, were involved in identifying the suspects. Since the process of identification, while not our focus of attention, contributes to the result in this case, we will detail the testimony regarding the identification procedures.

Several inconsistencies regarding Hannum's identification of Olbrot were raised at trial. The first Skokie police officer to arrive on the scene of the drug store was Officer Maher. For the purposes of sending a radio broadcast, Hannum described the two men to Maher as "two white males approximately five foot nine inches and shorter." Maher's written report based on Hannum's description was that the men were five feet nine inches tall. Olbrot is in fact five feet one inch tall.

Hannum also testified that immediately after the robbery he gave Officer Maher a signed statement in which he described the assailants as in their "20's, mid." In 1976 the year of the attempted robbery, Olbrot was 37 years old. Hannum again recorded his observations in a report directed to his supervisor in Springfield, but in that report he did not mention that he had seen Olbrot's face.

Hannum testified that he was asked by the officers involved in the investigation to go to the Chicago Police Department, Area 6 Robbery Division, to look through mug books. Hannum did not make any pretrial physical identification of Olbrot. When Hannum viewed the mug books on October 31, Olbrot was already a suspect because

his car had been identified by Heelan. In the first mug book Hannum viewed, he identified the photo of Olbrot as one of the two men involved in the robbery. In the next book Hannum identified a photo of Burke. No police officers were present in the room with Hannum when he looked through the mug books. The Chicago Police Department failed to record the page number on which Olbrot's photo was found in the mug book and the numbers that would identify the other photos surrounding petitioner. The transcript indicates that such a record is required by Chicago Police Department Identification procedures.

### C. Identification of Burke

Burke became a suspect in the attempted armed robbery case when he made a phone call to Paul Martin, a mutual friend of himself and Olbrot, on October 30, 1976. During that phone call, Burke asked Martin if he had seen Olbrot. At the time of Burke's phone call, about 10:45 a.m., several police officers were in Martin's home questioning him regarding the drugstore incident. Martin replied to Burke that he had not seen Olbrot, but that there were a lot of police officers present in his house. Officer Cappitelli testified that he then talked to Burke over the phone from the Martin residence and told Burke that he wanted to talk to him about Olbrot. Cappitelli testified that Burke volunteered the information that Olbrot was supposed to have met him that morning but had not arrived. Cappitelli then called Lieutenant Locallo at Area 6 headquarters and told him to talk to Burke at Burke's mother's home. When officers arrived at Burke's mother's home at 11:20 a.m., ·Burke was not there.

Lois Burke, Burke's estranged wife, also testified at trial that police officers made warrantless searches of her home on October 30, October 31, November 1, and November 2, 1976 in the presence of herself and her three children. Although Mrs. Burke did not give them permission to take anything, on November 1 and 2 she noticed that photographs of Burke were taken from her home.

Area 6 Officer Fornelli testified at trial that on October 30, 1976, at 6:00 a.m., shortly after the attempted robbery, Heelan was shown a mug book by Skokie police officers, but was unable to identify any picture resembling the driver of the car. In Heelan's report, dated November 4, 1976, he did not state that he viewed a mug book, but that he had "observed several photos." Area 6 Officer Paul testified that he could not recall how many pages were in the book nor could he describe the photos, other than to say that Heelan viewed them on October 30, and they were black and white penitentiary release photos. Skokie Officer Hennessey testified that he removed a photo of Olbrot from the book, doctored it by erasing ·the mustache and changing the hairline, and showed it to Heelan. Heelan did not identify Olbrot as the driver of the vehicle. Heelan testified that while he was attempting to make an identification he was told that a particular photograph was of a suspect named Olbrot.

On October 31, 1976, at 5:00 a.m., Heelan was shown another mug book by Fornelli and Paul and identified a picture of Raymond Burke. Thereafter ·Heelan was shown another five or six mug shots of other arrestees, plus another picture of Burke. Heelan testified that in this second set of pictures Burke was depicted wearing a tuxedo and "big tie." Fornelli testified that he did not inventory the mug book or record the page location of Mr. Burke's picture or the names of the other persons pictured on the page. Hennessey's report of the incident does not indicate that Heelan was shown mug books but that he was shown "more photos of the suspects." Hennessey testified that he dismantled the mug book immediately after the identification of Burke because he wanted the information on the back of the photograph. Fornelli also testified that he did not retain the mug book and could not reconstruct it.

On October 31, 1976 Hannum was taken to Area 6 Chicago Police headquarters where he identified Burke in the second

mug book he viewed. The testimony relating to the procedures used on October 31, 1976 for Hannum's viewing of mug books is detailed in the section relating to Olbrot's identification above.

On November 2 or 3, 1976, Hennessey brought another photograph of Burke for Heelan to identify. Hennessey testified that he had the officer in charge of the I.D. Section isolate Burke from one of the three photographs which were removed from Lois Burke's residence. Hennessey testified that he would have shown Heelan about six other photographs with the one of Burke since six is the number he normally used. The picture shown Heelan of Burke showed Burke wearing a big tie and a tuxedo.

### D. The Surprise Evidence

On the second day of defendants' joint jury trial in November 1979 for attempted murder, attempted armed robbery and aggravated battery, the state informed the court and the defense for the first time that Officer Von Ahn would testify at trial against the defendants. Von Ahn is a Los Angeles Police Officer who had arrested Olbrot in California and who had given a statement saying that Olbrot had told him in a bar about being involved in a robbery of a drug store in Indiana where someone was shot. Before trial the defense had believed that the Indiana statement was the only statement made by Olbrot that the state would attempt to use. On the second day of trial, however, the state indicated that Von Ahn would also testify that Olbrot had told him that he had committed a robbery in Illinois where a police officer was shot and that Olbrot had taken Von Ahn into the men's room and shown him a gunshot wound in his right shoulder. The court denied the defense motion for a continuance, but permitted the defense to depose Von Ahn the night before his testimony. During the deposition, Von Ahn stated that he had spoken to an Illinois assistant state's attorney named Callum and had told him about both of Olbrot's statements. Callum had been in charge of Olbrot's pros-

ecution. Von Ahn was allowed to testify at trial about the new statement of Olbrot.

### E. Closing Argument

At the November 1979 joint trial of Olbrot and Burke for attempted armed robbery, aggravated battery, and attempted murder, neither Olbrot nor Burke took the stand to testify. In his closing argument, the prosecutor made seven references to the defendants' failure to testify and to Olbrot's failure to exhibit his back. The prosecutor first referred to the evidence on the identity of the car:

> The car was purchased on October 15, 1976 by David Olbrot. David Olbrot also had personal papers in the back seat of that automobile. It is uncontradicted and undenied that the car was his.

Tr. 709. Later, referring to the alleged bullet wound Olbrot was supposed to have received during the attempted robbery, the prosecutor stated:

> Ladies and gentlemen, as sure as the sun rises in the East, that scar is on his back and that is uncontradicted and undenied.

Tr. 713. Finally, referring to the testimony of the California Officer Von Ahn, the prosecutor said:

> You heard Von Ahn testify. I was there and I got shot. He is saying this months after Lloyd Hannum makes his identification. Corroboration. That's what it's all about, corroborating everything Lloyd Hannum told you. And that conversation, ladies and gentlemen, is uncontradicted and undenied.

Tr. 714.

Defense counsel moved in limine after the prosecutor's opening closing argument to prevent the State from "further arguments to matters being uncontradicted and undenied. Everything is denied by a plea of not guilty. Other arguments in that regard are specifically intended to cast aspersions on the defendants." Tr. 718. The court denied defense counsel's motion but issued a warning to the prosecutor: "I just caution the State to stay away from that type of argument." Tr. 718.

The prosecutor, however, continued to make remarks pertaining to the defendants' failure to testify. In his rebuttal, the prosecutor made the following statement about Hannum's testimony:

He came in here and identified them because those are the guys who were in the drug store. Have you heard any evidence that they weren't in the drug store? Have you heard one thing ...

Tr. 775. At this point, Olbrot's attorney objected, but the prosecutor finished his statement:

contradictory of the testimony of Lloyd Hannum?

Tr. 775. The court then sustained defense counsel's objection, but gave no instruction to the jury regarding the defendants' constitutional right to remain silent. Later, the prosecutor again stated:

The evidence in this record is uncontradicted. Undenied. Those two men were in the drug store.

Tr. 781. The prosecutor referred to Olbrot's alleged wound a second time in his rebuttal:

All I know is he has a scar on his back and I cannot make him take his shirt off.

Tr. 783.

In his final remarks, the prosecutor again referred to the defendants' failure to testify:

The facts in this case are very, very simple. Those guys are robbers. You haven't heard one word of evidence that contradicts the State's case. Defense is built on paper. It's a paper defense. I implore you do not let them get away with it.

Tr. 785.

At the close of trial, defendants moved for a mistrial based on the prosecutor's closing argument but the court denied the motion. The court also denied defendants' motions for a new trial. The court imposed on Olbrot sentences of three to ten years for aggravated battery, six to ten years for attempted armed robbery and fifteen to one hundred years for attempted murder. The court imposed on Burke sentences of three to ten years for aggravated battery, six to twenty years for attempted armed robbery and thirty to ninety years for attempted murder. On May 3, 1982, the Illinois Appellate Court, First District, affirmed the convictions, holding that the closing argument "did not constitute a material factor in the convictions ... or result in a substantial prejudice to defendants." 106 Ill.App.3d 367, 387, 62 Ill.Dec. 270, 435 N.E.2d 1242. On October 5, 1982, the Illinois Supreme Court denied petitioner leave to appeal.

## II. REFERENCES TO DEFENDANTS' FAILURE TO TESTIFY

Direct reference by a prosecutor to a defendant's decision not to testify at trial is always a violation of the defendant's fifth amendment right against self-incrimination. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *United States v. Rodriguez,* 627 F.2d 110, 111 (7th Cir.1980). Indirect references to the defendant's failure to testify are constitutionally impermissible if "the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *United States v. Lyon,* 397 F.2d 505, 509 (7th Cir.), *cert. denied sub nom., Lysczyk v. United States,* 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968) (*citing United States v. Wright,* 309 F.2d 735 (7th Cir.1962), *cert. denied,* 372 U.S. 929, 83 S.Ct. 873, 9 L.Ed.2d 733 (1963)). In *United States v. Fearns,* 501 F.2d 486 (7th Cir. 1974), this court held that two prosecutorial references to "undisputed" testimony were indirect references to the defendant's failure to testify where "[t]here were no persons other than the defendants who could have disputed the [prosecution witness'] testimony apart from alibi witnesses." *Id.* at 490. Similarly, in *United States v. Handman,* 447 F.2d 853 (7th Cir.1971), we held that a prosecutor's argument that government testimony remained "intact,

unchallenged and uncontradicted" constituted an indirect reference to the defendant's failure to testify. *Id.* at 855. In *United States v. Buege,* 578 F.2d 187, 189 (7th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978), we found error where a prosecutor repeatedly depicted testimony as uncontradicted "where it was highly unlikely that at least a portion of the testimony could have been contradicted by anyone other than the defendant." *Id.* at 189. Finally, this court has even recognized that closing arguments regarding "uncontradicted" testimony which could have been contradicted by either the defendant or another witness were nonetheless impermissible because they "could have called attention to [defendant's] failure to testify on any issue—and thus to his failure to contradict much of the testimony which could not have been contradicted by anyone but him." *United States v. Poole,* 379 F.2d 645, 649 (7th Cir.1967). *Cf. United States v. Shue,* (7th Cir.1984) (prosecutor violated defendant's due process rights by referring in his closing arguments to the defendant's post-arrest silence and implying that the silence was inconsistent with a claim of innocence).

While the bulk of our cases regarding prejudicial prosecutorial remarks have involved federal cases and federal prosecutors, we think the principle at issue applies equally to state cases, such as the one at issue here. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that direct comments by a California state prosecutor regarding the accused's silence violated the accused's fifth amendment rights. Moreover, other circuits have granted writs of habeas corpus on the grounds that closing remarks by state prosecutors on a defendant's failure to testify were unconstitutional and so prejudiced the defendant's trial as to be beyond the doctrine of harmless error. *See, e.g., Hearn v. Mintzes,* 708 F.2d 1072 (6th Cir.1983); *Calloway v. Wainwright,* 409 F.2d 59 (5th Cir.1968), *cert. denied,* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969); *Schultz v. Yeager,* 403 F.2d 639 (3d Cir.1968), *cert. denied,* 394 U.S. 961, 89 S.Ct. 1309, 22 L.Ed.2d 562 (1969). *See also Hall v. Wainwright,* 733 F.2d 766 (11th Cir.1984) (upholding the propriety of federal appellate review of state prosecutor's comments on petition for writ of habeas corpus, but finding comments at issue were not errors of constitutional magnitude).

 Seven indirect references to a failure to testify, made after explicit cautionary advice from the presiding judge to "stay away" from such arguments, lead us to conclude that the prosecutor "manifestly intended" to make a comment about the defendants' failure to testify. Moreover, there is little doubt that this case comes within the confines of the rule requiring that indirect references "naturally and necessarily will be taken by the jury as a comment on the defendant's failure to testify." *Lyon,* 397 F.2d at 509. No one other than the defendants could have satisfactorily denied or contradicted the government's witnesses. Only Olbrot, for instance, could have contradicted Von Ahn's testimony as to his alleged California conversation with Olbrot. It is true that the two customers who fled the drugstore at the time of the robbery might have been called to contradict Hannum's testimony as to who was in the drug store, but, as the state admitted during oral argument, there is nothing on the record to indicate that either side knew the identity of these individuals. Moreover, because the jury had only heard two passing references to these individuals, it is unlikely that these customers would have come to mind as possible providers of contradictory evidence or that they had been the force behind the prosecutor's "uncontradicted" remarks.

Furthermore, while the fifth amendment is not in fact implicated by Olbrot's failure to exhibit his back, therefore making statements about Olbrot's alleged scar less egregious in themselves than the continual reference to "undenied" testimony, we do not think that ends the matter. Remarks about the scar or regarding who was in the

drugstore might have been contradicted by Olbrot's nontestimonial exhibition of his back or by securing the testimony of the two fleeing customers. Nonetheless, these remarks primarily call attention to the testimony which could have been contradicted only by Olbrot's and Burke's testimony. The crucial inquiry in evaluating the prejudice conveyed by indirect reference to a failure to testify is a consideration of how the jury would view the closing argument as a whole. A juror is unlikely to be aware of the distinctions between testimonial and nontestimonial evidence, so that the obvious conclusion to be drawn from the prosecutor's remarks regarding the scar was that the defendant's failure to show his back was indicative of guilt. Such indirect references to a failure to testify violate the defendant's fifth amendment rights and are clearly improper. Similarly, repeated references to "uncontradicted" testimony also is likely to cause the jury to view the closing argument as a commentary on the defendant's failure to testify and as a suggestion to view that failure to testify as indicia of guilt. This, too, is improper.

### III. HARMLESS ERROR

■ ■ Once a constitutional violation is established, the government can only prevail if it sustains the burden of proving beyond a reasonable doubt that the defendant would have been convicted absent the prosecutor's unconstitutional remarks. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). To satisfy its burden, the government must do more than demonstrate by circumstantial evidence that the defendant's guilt exists. Rather, the case against the defendant must be "overwhelming" in order to apply the harmless error rule. *See United States v. Shue,* 746 F.2d 1280, 1287–88 (7th Cir.1984); *United States v. Wilkins,* 659 F.2d 769, 774 (7th Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *United States v. Handman,* 447 F.2d 853, 856 (7th Cir.1971). *See also*

*United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

The level of evidence required for a finding of overwhelming guilt is exemplified in *Wilkins* and *Hasting.* In *Wilkins,* a bank robbery case, the defendant was arrested with the stolen money and guns in the getaway car a few blocks from the bank. *Wilkins,* 659 F.2d at 774. Similarly, in *Hasting,* the Supreme Court relied on the fact that "a more compelling case of guilt would be difficult to imagine." *Hasting,* 461 U.S. at 503, 103 S.Ct. at 1977. In *Hasting,* the defendants were promptly picked out of a line-up, there were corroborating eyewitnesses, stolen property was found in one of the defendant's possession, and there had been identification of the car used and one of the defendant's fingerprints.

By contrast, the district court in Olbrot's case granted the writ because of the "circumstantial evidence introduced at trial" regarding Olbrot's alleged scar, and because of the "lack of substantial direct evidence to show that [Olbrot] was the second assailant." The only direct identification of Olbrot was made by Officer Hannum who admitted to seeing the assailant's face only briefly. The only other witness could not identify Olbrot. Further, Hannum's original identification of the height of the shorter assailant alleged to be Olbrot was off by many inches. The identification procedures of the police were tainted by the prosecutor's remarks that Olbrot had not denied the testimony of Hannum. Similarly, the car in which Burke allegedly was seen was registered to Olbrot. This evidence was tainted by the prosecutor's remarks that the evidence was undenied since only Olbrot could have explained how Burke came to have his car.

The fact that there was some incriminating evidence does not render harmless the prosecutor's unconstitutional statements. Given the importance of the identification evidence in this case, we hold that the government has not demonstrated that Ol-

brot and Burke would have been convicted absent the prosecutor's repeated allusions to Olbrot's and Burke's failure to testify. The case against Burke and Olbrot hardly can be viewed as "overwhelming" as was the case against the defendant in *Hasting.* Thus, there is more than a reasonable possibility that the prosecutor's comments contributed to Olbrot's and Burke's conviction. It is not at all clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have returned a verdict of guilty. Therefore, we cannot accept the not reversible error approach of the closing argument adopted by the Appellate Court of Illinois.

Furthermore, the trial judge in this case did not immediately instruct the jury to disregard the prosecutor's remarks and inform them of the defendants' right to remain silent. In his final instruction the judge did tell the jury that "the defendants are not required to prove their innocence. The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict." Tr. 793–94. Such final jury instructions are "ordinarily not sufficient," however, to cure constitutional errors. *United States v. Buege,* 578 F.2d 187, 189 (7th Cir.), *cert. denied,* 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978).

## IV. DOUBLE JEOPARDY

Finally, we address Olbrot's and Burke's double jeopardy argument. Defendants argue that under *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), their double jeopardy rights were violated because under Illinois law the defendants should not have been convicted of both aggravated battery and attempted murder on the basis of one act. Under Illinois law, aggravated battery is a lesser included offense of attempted murder.

*Missouri v. Hunter* establishes a twofold test for determining whether two statutes describe the same offense for the purpose of double jeopardy analysis. The first element of the test is whether the legislature intended to punish persons twice for a single criminal act. If such legislative intent is established, then sentences under both statutes may be pronounced without violating constitutional double jeopardy principles. If, on the other hand, legislative intent is not ascertainable, then the court is to determine whether the two offenses are the same offense under the "overlapping elements" test of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

■ Defendants argue that because Illinois courts have held that aggravated battery is a lesser included offense of attempted murder and persons are not to be convicted of both crimes on the basis of one act, *People ex rel. Walker v. Pate,* 53 Ill.2d 485, 489, 292 N.E.2d 387 (1973), then the Illinois legislature could not have intended to convict persons of both aggravated battery and attempted murder on the basis of a single act.

The Illinois appellate court in this case, however, rejected defendants' double jeopardy argument, concluding that two acts were involved in this case.

> In the case at bar, separate and distinct acts occurred upon which convictions for both aggravated battery and attempted murder are proper. During the robbery attempt, Burke, armed with a revolver, began fighting with Thun. Olbrot then appeared and fired a shot, injuring Thun. These acts clearly constituted separate acts committed during the attempted robbery, for which defendants may be held accountable.

*People v. Olbrot,* 106 Ill.App.3rd 367, 377, 62 Ill.Dec. 270, 435 N.E.2d 1242 (1982). We agree that the scuffle is distinct from the shooting, and we therefore reject the defendants' double jeopardy claim.

Defendants claim other errors in their trial, particularly with reference to the photographic identification procedures and to procedural matters in the district court, but

given our holding regarding the prosecutor's statements and the resulting grant of the writ of habeas corpus it is not necessary to discuss these other arguments.

In conclusion then, for the reasons mentioned above we find that the prosecutor committed constitutional error when he made seven references to "uncontradicted and undenied" testimony and to Olbrot's failure to exhibit his back. *Lyon,* 397 F.2d at 509. We warned in *Fearns,* and repeated that warning in *Buege* that "it will usually be rash for the prosecutor to predict" that indirect references to a defendant's failure to testify are not prejudicial. *Buege,* 578 F.2d at 190 (*quoting Fearns* 501 F.2d at 490). The prosecutor here, as did the prosecutor in *Rodriguez,* came too close to "the edge of the precipice." *Rodriguez,* 627 F.2d at 114. While the prosecutor in this case was not the first to err, we hope that our admonitions regarding closing arguments will not again go "unheeded," *see id.* at 114, and that prejudicial indirect references to a defendant's failure to testify will cease to be an issue before this court. We therefore affirm Judge Baker's grant of Olbrot's writ of habeas corpus and reverse Judge Plunkett's denial of Burke's writ. Judge Baker's order that a new trial take place within 120 days of the mandate reaching his court is affirmed. Judge Plunkett is hereby ordered to issue a writ releasing Burke unless Burke is retried within the 120 day time limit.

AFFIRMED as to 84–1343 and 84–1481; REVERSED as to 84–1430.