James WILLISON, Petitioner,

v.

WARDEN, GREEN BAY CORRECTIONAL INSTITUTION, Respondent.

No. 86-C-417.

United States District Court, E.D. Wisconsin.

March 27, 1987.

---

Thomas E. Martin, Milwaukee, Wis., for petitioner.

Steven D. Ebert, Asst. Atty. Gen., Wis. Dept. of Justice, Madison Wis., for respondent.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

On August 13, 1982, petitioner James Willison was convicted in the state circuit court of being party to the crimes of first-degree murder and armed robbery. He was sentenced to life imprisonment for the murder conviction and to a consecutive term of twenty years in prison for the armed robbery conviction. On February 15, 1983, the state trial judge, Honorable James P. Fiedler, denied Mr. Willison's post-conviction motion for a new trial. On December 16, 1983, the Wisconsin Court of Appeals affirmed in an unpublished decision and order. *State v. Willison*, 117 Wis.2d 780, 343 N.W.2d 829 (Ct.App., Dist. IV). On March 13, 1984, the Wisconsin Supreme Court denied Mr. Willison's petition for review, 117 Wis.2d 789, 349 N.W.2d 87.

Mr. Willison now petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. He claims that prejudicial pretrial publicity denied him due process of law; that the trial judge's failure to conduct a more individualized voir dire of the jury panel violated his sixth amendment right to trial by an impartial jury; that the state prosecutor's remarks to the jury during closing argument were improper and denied him due process of law and violated his fifth amendment right not to testify; and that the trial judge's failure to submit a second-degree murder instruction to the jury was a violation of due process and of his right to a fundamentally fair trial. Mr. Willison's petition will be denied.

## I. BACKGROUND

The relevant facts of this case were summarized by the Wisconsin Court of Appeals:

Leona Milfred, aged 76, was stabbed to death in her rural Richland County grocery store shortly after 4:00 p.m. on February 10, 1982. Defendant [petitioner in this action] and Bonnie Smith had been seen in the area that afternoon, and a car matching the description of Smith's was observed parked in front of the Germantown store between 4:00 and 4:15 p.m. Evening news reports of the crime included descriptions of the pair and their car and indicated an apparent robbery. On February 11, 1982, employees of the North Freedom branch of the Reedsburg Bank became suspicious when a man and a woman matching news descriptions of the murder suspects appeared at the bank with a jar of coins to exchange. An employee took down the license plate number of their car and reported it to police.

When police stopped [petitioner] later that day, he acknowledged being in Germantown the day before and gave the officers a note written by Bonnie Smith which implicated them in the crime. He was arrested and questioned. He admitted being at Mrs. Milfred's store with Smith the previous day and reported seeing blood on Smith's clothing when she left the store. He denied seeing or participating in the killing. Later, he admitted being in the store during Smith's attack on Mrs. Milfred.

An autopsy revealed Mrs. Milfred died from loss of blood caused by many knife wounds to the head and upper body. Smith was arrested and charged with first-degree murder and armed robbery. [Petitioner] was charged with being party to both crimes.

Mrs. Milfred's murder and the arrest of [petitioner] and Smith were reported in the news media throughout the state. Many reports featured earlier statements by Mrs. Milfred about previous robberies and her fear for her own safety. Comments on the crime appeared in at least two newspapers editorials—one in Dodgeville, the other in Madison. In May 1982, [petitioner] moved for a change of venue because the extensive publicity made it unlikely that an impartial jury could be found in Richland County. The trial court granted a change of venue to adjacent Iowa County.

On August 9, 1982, jury selection began. The court denied [petitioner's] request that each prospective juror be questioned in chambers about his or her knowledge of the crime and the effects of pretrial publicity. After a day-long voir dire during which seventy prospective jurors were questioned in the courtroom, [petitioner] again moved for a change of venue on grounds that an impartial jury could not be selected and that the voir dire questioning was insufficient to reveal prejudice resulting from pretrial publicity. The trial court denied this motion and the jury was sworn.

[Petitioner] did not testify at the trial. During closing arguments, the prosecutor commented on defense counsel's failure to present evidence rebutting the state's case and analogized the crime against Mrs. Milfred to the plight of many elderly rural citizens. The trial court overruled [petitioner's] objection that the prosecutor improperly drew attention to [petitioner's] failure to testify and that his remarks were inflammatory. [Petitioner] requested that the jury be instructed on second-degree murder in addition to the crimes charged. The trial court refused to give the instruction....

Mr. Willison does not dispute these facts or challenge the presumption of correctness which attaches to them in this proceeding. 28 U.S.C. § 2254(d).

## II. PREJUDICIAL PRETRIAL PUBLICITY

### A. Due Process

Petitioner first contends that the trial judge's refusal to change the venue out of Iowa County denied him due process. He claims that the judge's factual determination that an unbiased jury could not be selected in Richland County should be deemed to apply with equal force to adjoining Iowa County. He argues that the people of Iowa County were exposed to the same prejudicial pretrial publicity as the people of Richland County, that the two rural counties are demographically similar, and that therefore a fair trial by an impartial jury could not be obtained in the former any more than it could have been in the latter.

On three occasions, the United States Supreme Court has invalidated state criminal convictions based upon inflammatory publicity without "requiring a showing of identifiable prejudice to the accused." *Estes v. Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). In *Estes, Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court ruled that due process had been presumptively denied because "[t]he proceedings ... were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). In these cases, the petitioners' convictions were obtained "in a trial atmosphere which had been utterly corrupted by press coverage," *Id.* at 798, 95 S.Ct. 2035, and prejudice was presumed without examining the record of voir dire conducted by the trial judge for evidence probative of actual juror prejudice.

In this case, the media coverage upon which the petitioner's due process claim is based can be divided into three general categories: (1) Mrs. Milfred, (2) the petitioner, and (3) the criminal justice system. Mrs. Milfred's killing was deplored and lamented in several articles. Her fear of strangers was reported in connection with three previous robberies by which she had been victimized. News coverage of the petitioner—his previous troubles with the authorities, his parents' difficulties with him, and his attitude toward crime—was largely confined to one newspaper article published in the Wisconsin State Journal. The State Journal ran other articles about Mrs. Milfred's murder, including one editorial entitled "Paula and Leona: What can we do?" However, the record does not show that any of them mentioned the petitioner either by name or by reference to him as the accused in connection with the killing.

The most inflammatory item of pretrial press coverage contained in the record is a Dodgeville Chronicle editorial published March 25, 1982. Dodgeville is the county seat of Iowa County where the petitioner was tried and convicted. The editorial cited "a story in Sunday's Wisconsin State Journal about the accused killer of Leona Milfred (from Germantown) indicat[ing] that the young man had thought he could get away with crime. He had been placed on probation for several previous violations and apparently came to the conclusion that he could get away with anything without being severely punished ... Before the crime rate in Wisconsin gets out of hand, something has to be done."

By comparison to the *Rideau, Estes,* and *Sheppard* cases, however, the media coverage in this case was relatively moderate and diffuse. In *Estes,* "[m]assive pretrial publicity totalling 11 volumes of press clippings ... had given [the petitioner's case] national notoriety...." 381 U.S. at 535, 85 S.Ct. at 1629. "The press coverage of the Estes trial was not nearly as massive as the attention given by the Cleveland newspapers and broadcasting stations to Sheppard's prosecution." *Sheppard, supra,* 384 U.S. at 353–54, 86 S.Ct. at 1517. In *Rideau,* a filmed interview of the defendant sitting in the local jail surrounded by sheriff's deputies and confessing to the three felonies with which he had been charged was broadcast three times on television throughout the locale in which the crime and trial took place.

Moreover, as the trial judge noted, *see* Tr. at 29 and 102, most of the objectionable news reporting in this case occurred in February and March 1982, in the days and weeks immediately following Mrs. Milfred's murder, not later in July and August when trial and jury selection were about to commence. By contrast, in *Irvin v. Dowd,* 366 U.S. 717, 725, 728, 81 S.Ct. 1639, 1644, 1645, 6 L.Ed.2d 751 (1961), a "barrage of [bitterly prejudicial] newspaper headlines, articles, cartoons, and pictures was unleashed against [the petitioner] during the six or seven months preceding his trial." Where, as here, pretrial press coverage "peaks" several months before trial begins, "it is a perfectly natural phenomenon, familiar to all," that public passion and prejudice toward the accused can be expected to subside in the interim. *Compare Patton v. Yount,* 467 U.S. 1025, 1034, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984) with *Murphy, supra,* 421 U.S. at 802, 95 S.Ct. at 2037.

■ For the foregoing reasons, I find that the record of pretrial publicity before this court does not support the conclusion that "the setting of [the petitioner's] trial was inherently prejudicial...." *Murphy, supra,* 421 U.S. at 803, 95 S.Ct. at 2038. *Rideau, Estes,* and *Sheppard* "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or news accounts of the crime with which he is charged alone presumptively deprive the defendant of due process." *Id.* at 799, 95 S.Ct. at 2036. It has not been shown that the media coverage which the petitioner's case received utterly corrupted the atmosphere surrounding his trial or was so pervasive as to raise the presumption of juror prejudice in violation of due process.

## B. Sixth Amendment

The petitioner next contends that his sixth amendment right to trial by an impartial jury was violated by the trial judge's failure to conduct individual rather than collective voir dire. He contends that the method of voir dire conducted by the trial judge was inadequate to reveal juror bias. The petitioner contends that the judge was constitutionally required to question each individual venireman privately in order to discover hidden prejudices which might otherwise go undetected. In support of this contention, petitioner cites the trial judge's finding that every member of the jury panel had been exposed to news coverage of the crimes with which he was charged. *See* Tr. 29.

"A preconceived notion as to the defendant's guilt or innocence, without more, does not rebut a juror's presumed impartiality, as long as the juror can lay aside his or her impression and render a verdict on the evidence." *Lincoln v. Sunn,* 807 F.2d 805, 815 (9th Cir.1987), *citing Murphy, supra,* 421 U.S. at 800, 95 S.Ct. at 2036. The trial judge's finding that jurors exposed to pretrial press coverage in this case would be able to set aside their impressions and decide the case on the evidence is entitled to the statutory presumption of correctness due a state court's factual findings under 28 U.S.C. § 2254(d). *Patton, supra,* 467 U.S. at 1038, 104 S.Ct. at 2892. "Thus, the question is whether there is fair support in the record for the state courts' conclusion that jurors here would be impartial." *Id.* at 1038, 104 S.Ct. at 2892, *citing* 28 U.S.C. § 2254(d)(8).

The selection and impaneling of the jury in this case consumed one full day. At the outset of the voir dire the entire pool of veniremen was placed under oath by the judge's clerk. After ascertaining that each member of the panel was familiar with the case through the news media, the judge informed the panel of their obligation, if they were chosen to serve, to keep an open mind, "to listen to the evidence and [to] reach a fair and impartial verdict based solely on the evidence received in this courtroom." Tr. 29. He also informed the panel that the defendants were presumed to be innocent, were not required to prove their innocence and were not required to testify. Tr. 30. He then inquired whether despite the press coverage to which they had been exposed any member of the panel could not discharge his or her obligation as he had described it.

Of the twenty veniremen initially sworn, eight were excused by the judge after admitting that they could not faithfully discharge their obligations as jurors if chosen to serve. After the eight were replaced, the judge repeated that the accused were presumed to be innocent, were not required to testify and that the state was required to prove them guilty beyond a reasonable doubt. He then asked several questions of the panel concerning their ability to honor the presumption of innocence which would attend the accused throughout their joint trial and to put whatever familiarity they had with the case out of their minds and reach an impartial decision based solely on the evidence received in court. One additional member of the panel was excused after admitting her prejudice against the petitioner.

The judge then continued to question the panel members in an attempt to reveal potential bias. The judge made several comments regarding the protections enjoyed by the accused and again the fact that jurors chosen to serve must disregard all knowledge of the case acquired outside the courtroom and base their decision solely on the evidence adduced in court. No one came forward in response to the judge's questions at this point in the voir dire.

In the afternoon, the judge interviewed a second panel of veniremen. He again repeatedly admonished and instructed panel members in substantially the same way as he had during the morning. In response to his questions regarding news coverage of the case, the judge dismissed eight additional veniremen for cause. Counsel were then permitted to question the remaining panel members. At the completion of their questioning, counsel each exercised six peremptory strikes. After the jury was

sworn, the judge instructed the jurors not to talk about the case with anyone and not to watch or listen to the evening news. The jury was then sequestered and prevented from viewing or reading news accounts of the matter during the week-long trial.

The record in this case contains abundant support for the state court of appeals' conclusion that "the trial court's handling of the voir dire examination protected [petitioner's] right to trial by an impartial jury." *Willison, supra,* No. 83–418–Cr, Slip op. at 11. The trial judge specifically and repeatedly asked prospective jurors whether their familiarity with the case would prevent them from reaching a decision based only on the evidence received in the courtroom. His extended questioning clearly focused the attention of panel members on possible prejudice that they may have harbored against the petitioner. Ultimately, nearly twenty prospective jurors came forward, candidly admitted that they could not sit impartially and were excused for cause.

■ Petitioner has not produced any evidence demonstrating the "actual existence of such an opinion in the mind of [any] juror as will raise the presumption of partiality ...," as required by *Irvin, supra,* 366 U.S. at 723, 81 S.Ct. at 1643; indeed, he does not specifically contend that any particular member of the jury was demonstrably biased against him. *See Lincoln, supra,* 807 F.2d at 815. Unlike *Irvin,* where "[t]wo-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that some other murders were attributed to him, some going so far as to say it would take evidence to overcome their belief," 366 U.S. at 728, 81 S.Ct. at 1645, "[t]he voir-dire in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy, supra,* 421 U.S. at 800, 95 S.Ct. at 2036; *see also United States v. Wilson,* 715 F.2d 1164, 1168 (7th Cir.), *cert. denied,* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983), rejecting the appellants' claim "that their fair trial rights were violated by the district judge's failure to interrogate jurors individually with respect to pretrial publicity in the case."

## III. PROSECUTOR'S CLOSING ARGUMENT

The petitioner's second set of arguments concern statements made by the state prosecutor during closing arguments before the jury. He claims that certain comments by the prosecutor, including an alleged misstatement of the Wisconsin law of party to a crime, denied him a fair trial and due process of law. In addition, he contends that the prosecutor impermissibly commented on his failure to testify, in violation of the fifth amendment. These contentions implicate distinct constitutional standards and will be considered separately.

### A. Due Process

In his closing argument to the jury, the prosecutor characterized petitioner's trial as "The Leona Milfred Story ... the story of all elderly people who can't defend themselves ... and who refuse to give up." Tr. 849–50. He further commented that the petitioner's crimes would "probably [change the] life of every elderly person who' is living in a rural area running a business." Tr. 851. He also stated, in substance, that the system was so vigilant in advising people like the petitioner of their rights, even going so far as to have "little plastic cards we read to them. We have typed sheets they read and sign off on their rights, constantly guarding their rights. The police scrupulously honor their rights. Where was Leona Milfred's rights? Where were they? Where are the rights of all the elderly who sit out in these rural areas who are easy prey for cowards like [petitioner]?" Tr. 895.

Later, in rebuttal, the prosecutor continued, stating that he "fervently believed" petitioner and his codefendant "plan[ned their crimes] ahead of time." Tr. 935. Finally, the prosecutor commented that "we as citizens feel outraged of [sic] what is going on and you always say I wish I could do something about it. You can...." Tr. 941. Over an objection sustained by the

trial judge, he concluded that "[y]ou can stand up for Mrs. Milfred and do something for Mrs. Milfred. You can go in that jury room and come back ... with a verdict of guilty and in that small way, make up somewhat for this dasterly [sic] deed and that's a guilty verdict on both counts...." Tr. 942.

To prevail on his claim that the prosecutor's comments deprived him of a fair trial, "it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, —— U.S. ——, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986), *quoting Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983). "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* 106 S.Ct. at 2472, *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In order to make this determination, the court must examine the challenged comments in the context of the trial as a whole, considering the probable effect they would have on the jury's ability to judge the evidence fairly. *See United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985); *see also Jentges v. Milwaukee County Circuit Court*, 733 F.2d 1238, 1242 (7th Cir.1984).

■ Under the ABA Standards for Criminal Justice, which the Supreme Court has referred to as "useful guidelines," *Young, supra*, 470 U.S. at 8, 105 S.Ct. at 1043, "[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law...." ABA Standards 3–5.8(d) (2d ed. 1980). Judged under this standard, the prosecutor's references to the case as "The Leona Milfred Story" and as "the story of all elderly people who can't defend themselves" were inappropriate. Similarly, his comment that the Milfred murder would probably change the lives of "every elderly person who is living in a rural area ..." improperly "diverted the jury from its duty

to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused...."

■ The prosecutor's comment that he thought the Milfred murder would probably change the lives of the rural elderly who run businesses was questionable as an expression of his personal opinion of the case. "Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." *ABA Standards, supra*, at 3–89. For the same reason, the prosecutor's statement that he "fervently believed" the petitioner had planned his crimes ahead of time was, at best, marginally acceptable. "[S]uch comments fail to add anything in any way probative of the real issues confronting the trier of fact...." *United States v. Grooms*, 454 F.2d 1308, 1312 (7th Cir.1972).

■ Finally, the prosecutor's comparison of the rights of the accused in our criminal justice system with the "rights" of the rural elderly such as Mrs. Milfred tended to be inflammatory. "The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury." *ABA Standards, supra*, at 3–5.8(c). In addition, the prosecutor was ill-advised to exhort the jury to "do something about" the outrage they feel as citizens with "what is going on" and to "stand up ... and do something for Mrs. Milfred." "[T]hat kind of pressure ... by the prosecutor ... has no place in the administration of criminal justice...." *Young, supra*, 470 U.S. at 18, 105 S.Ct. at 1048.

■ "It is well understood in the realm of ethical and proper conduct of a criminal trial, that the prosecutor 'may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.'" *United States v. Chaimson*, 760 F.2d 798, 809 (7th Cir.1985), *quoting Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). I conclude that while there were several foul

blows struck by the prosecutor, they were not so inflammatory as to have infected the trial with unfairness or to have rendered the resulting conviction a denial of due process.

### B. Fifth Amendment

The fifth amendment prohibits the prosecutor from directly referring to the defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). In addition, "[i]ndirect references to the defendant's failure to testify are constitutionally impermissible if 'the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify.'" *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir.1985), *quoting United States v. Lyon*, 397 F.2d 505, 509 (7th Cir.), *cert. denied sub nom., Lysczak v. United States*, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968). This principle applies equally to federal criminal cases and to petitions by state prisoners for writs of habeas corpus. *Burke, supra*, 756 F.2d at 1301.

The petitioner first contends that the prosecutor impermissibly referred to his failure to testify at the beginning of his closing argument: "No evidence was set forth so refuting or rebutting any of the evidence which we put forth in this court during the course of the trial...." Tr. 848.

In *United States ex rel. Adkins v. Greer*, 791 F.2d 590, 597 (7th Cir.1986), the court of appeals reaffirmed its holding that "a reference to the State's evidence as 'uncontradicted' or 'unrefuted' may violate the nontestifying defendant's Fifth Amendment rights if the remark has 'the natural and necessary effect of calling the attention of the jury to [the defendant's] failure to testify.'" Read in context, it is reasonably clear that the prosecutor's comment in this case represented a general reference to the failings of the defense, not a remark which would naturally and necessarily remind the jury that the petitioner failed to

testify. The prosecutor's comment that "[n]o evidence was set forth ... refuting or rebutting any of the [state's] evidence ...." is very similar to the prosecutor's remark in *Adkins, supra,* 791 F.2d at 598, that "[t]he state's evidence is the only evidence in the case." The court in *Adkins* rejected the petitioner's fifth amendment claim, holding that such a general statement did not impermissibly refer to his decision not to testify.

In his rebuttal argument to the jury, the prosecutor began by responding to defense counsel's closing arguments:

> What did Mr. Stoltz stand up here and say about that gun? Either I'm getting a little deaf or something happened because I missed it. I didn't hear a thing. What did he say about Jimmy parking on the wrong side of the street facing west to get away? I didn't hear anything about that. What was his rational[e] for Jimmy helping Bonnie make up the story and telling the cops hey, four o'clock, we've been here since. Did you hear anything about that? No. All we heard was a lot of stuff about you going into the jury room, stuff like that, and don't take him down with the crazy woman. Lets not talk about that. Lets talk about the facts.
> Tr. 940

In his next comments, however, the prosecutor clearly changes contexts, so that he is no longer responding to defense counsel but is instead referring to petitioner himself:

> What did *he* say about the business of going to the Polish Palace? What did *he* say that night of spending the night with her? What did *he* say about saying yeah, yeah, yeah and hanging up the phone when *he* found out poor Mrs. Milfred was dead? What did *he* say about going to the Bank in North Freedom? What did *he* say about not going to the police after *he* left Bonnie off at the Ford residence? What did *he* say about standing there when Serena or at the Serena Sanord [sic] and Richard Ford residence, [when] Bonnie Smith was composing that letter and *he* and her are

running in and out of the bathroom? What did *he* say about those things? Nothing. Zero. Zilch. *He* didn't say a darn thing about it because there is nothing *he* could say....

Don't fall for that. *He* never said a thing about any of that. Why did *he* give the letter to the police? I heard no explanation. Look, I'm not going to go on and on.

Tr. 940–41 (emphasis supplied).

■ The foregoing quotation cogently demonstrates that the prosecutor repeatedly referred to petitioner's failure to come forward and answer the state's evidence. What began as a legitimate response to defense counsel's closing remarks digressed into language that was "manifestly intended to be [and] was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *Burke, supra,* 756 F.2d at 1300. The respondent's assertion that the prosecutor's references were to defense counsel's silence rather than to petitioner's belies the sense and plain import of the words quoted above. Moreover, it is clear from the record that only the petitioner himself could have rebutted the evidence to which the prosecutor referred. *See Adkins, supra,* 791 F.2d at 597–98. Therefore, I conclude that the prosecutor's references to the petitioner's failure to respond were constitutionally impermissible under the fifth amendment.

## IV. HARMLESS ERROR

A "[f]inding of a federal constitutional error does not require ... [the granting of a writ of habeas corpus]; there may be some such errors which, in the setting of a particular case, are so unimportant and insignificant that they may be deemed harmless, consistent with the Constitution." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986), *citing Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966). "Once a trial error has been identified as one of constitutional magnitude, then the [harmless error] standard must be applied to determine whether the [state] conviction must be reversed." *Id.* 798

F.2d at 943, *citing United States ex rel. Miller v. Greer,* 789 F.2d 438, 443–44 (7th Cir.1986) (en banc). "The question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defen[dant to testify] ... is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983).

■ The violation of petitioner's constitutional rights by the prosecutor in this case must be deemed harmless. The record is replete with indicia of guilt which make it clear beyond a reasonable doubt that "honest and fair-minded jurors" would not have acquitted petitioner but for the errors committed here. *Burns, supra,* at 943. The evidence presented at trial included the testimony of a sheriff's department investigator, John Schweiger, to whom petitioner gave several statements regarding his activities on the day of Mrs. Milfred's robbery and murder. Mr. Schweiger testified that petitioner admitted to him that he and his co-defendant, Bonnie Smith, had discussed committing a robbery on the morning of February 10, 1982. This admission followed several lies and half-truths petitioner told police concerning his participation in the crimes charged.

The evidence further showed that petitioner and Ms. Smith had attempted to obtain a gun from Ms. Smith's mother on a false pretense earlier the same day that the robbery-murder took place. There was also testimony that petitioner and Ms. Smith entered Mrs. Milfred's store earlier the same day to purchase gas and that the two drove by the store several more times following their initial visit, visibly "casing" the place and waiting until it was empty of customers. These facts render implausible the petitioner's claim that he did not take his robbery discussion with Ms. Smith seriously and that he thought that she wanted to return to Mrs. Milfred's store merely to purchase paper for her son.

Any reasonable doubt about petitioner's intention to aid and abet Ms. Smith in the ensuing murder is dispelled by his actions during and immediately following the crime. By his own admission petitioner observed Ms. Smith inside the Milfred store

on top of Mrs. Milfred and heard Mrs. Milfred asking Ms. Smith not to kill her, that she would give her the money. Petitioner then exited the store to wait for Ms. Smith in his car. Although he did not actually witness or physically assist in the killing, when Ms. Smith joined him in the car a few minutes later, petitioner observed blood on her hands and clothes and a knife in her hand. Petitioner then drove the car away from the scene of the crime. Along the way, he stopped to allow Ms. Smith to wash the blood from her hands. When they arrived at the house of some friends, petitioner assisted Ms. Smith in fabricating a story to explain the blood on her clothes. The following day he accompanied Ms. Smith to a bank with the money taken from Mrs. Milfred's store and assisted her with the composition of a letter designed to prevent their capture by police; later that day, petitioner gave the letter to police.

The court of appeals for this circuit has consistently held that the case against a criminal defendant or habeas petitioner whose constitutional rights have been violated must be "overwhelming" in order to apply the harmless error rule. *See Burns, supra,* 798 F.2d at 943, *citing United States v. Shue,* 766 F.2d 1122, 1133 (7th Cir.1985), and *Burke, supra,* 756 F.2d at 1302. Here, the petitioner's attempt to cast himself in the passive role of Ms. Smith's scared, innocent driver does not bear scrutiny under the overwhelming weight of the state's case. Therefore, while the prosecutorial error at petitioner's trial "may have altered the basis on which the jury decided [his] case," *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 3108 n. 11, 92 L.Ed.2d 460 (1986), there is no reasonable possibility that it contributed to the conviction. *See Hasting, supra,* 461 U.S. at 506, 103 S.Ct. at 1979, *quoting Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

## V. SECOND DEGREE MURDER JURY INSTRUCTIONS

Petitioner's final contention is that the trial court's failure to instruct the jury on second-degree murder in addition to first-degree murder deprived him of due process. " 'The failure to instruct on a lesser included offense, even if incorrect under state law, does not warrant setting aside a state conviction unless failure to give the instruction could be said to have amounted to a fundamental miscarriage of justice.' " *Williford v. Young,* 779 F.2d 405, 406 (7th Cir.1985), *quoting Nichols v. Gagnon,* 710 F.2d 1267, 1269 (7th Cir.1983).

Under the facts of this case, there is no basis for holding that the omission of a second-degree murder instruction amounted to a fundamental miscarriage of justice. The evidence presented showed that Ms. Smith, petitioner's principal, entered Mrs. Milfred's store armed with a knife and that Mrs. Milfred received over 60 stab wounds to her neck and body. The evidence also showed that Ms. Smith killed Mrs. Milfred after arguing with her, hitting and pushing her. In her statement to police, Ms. Smith gave details of the killing which clearly indicate that it was a calculated and premeditated act, motivated by a desire to quiet Mrs. Milfred for good. This scenario plainly presents a case of first-degree murder with the specific intent to kill, not a homicide caused by imminently dangerous conduct evincing a depraved mind as the petitioner contends. *See* Wis.Stat. § 940.-02.

Therefore, IT IS ORDERED that the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, be and hereby is denied.